COLEMAN *v.* TURNER CARTAGE CO.

MASTER AND SERVANT—ASSUMED RISK—NOTICE OF DANGER—DE-
FECTIVE APPLIANCES.

Having knowledge or notice that a rope, by means of which
plaintiff was lowering a tank weighing upwards of three or
four tons, was fraying on the edge of the tank which was
in danger of falling, plaintiff, an experienced workman,
chargeable with general knowledge of the weight of the tank,
the strength of the rope and the dangers attending his work,
assumed the risk of the parting of the rope upon his mount-
ing the tank to do what he could to prevent its fraying and
breaking.

Error to Wayne; Murphy, J. Submitted January 8,
1913. (Docket No. 38.) Decided March 20, 1913.

Case by George Coleman against the Turner Cartage
Company for personal injuries. A judgment for defend-
ant, on a verdict directed by the court, is reviewed by
plaintiff on writ of error. Affirmed.

*Thomas A. Conlon*, for appellant.

*Keena, Lightner, Oxtoby & Oxtoby*, for appellee.

Plaintiff, a man 35 years of age, had been engaged for
about 15 years with various truck companies in the city of
Detroit. Defendant is a truck company, and for the past
six or seven years has undertaken "heavy work;" that is,
the moving of heavy or bulky objects. When defendant
entered upon this particular branch of its business, it en-
gaged plaintiff, who thereafter acted as foreman of a gang
composed of men hired by defendant.

A large tank had been shipped to the Detroit Brewing
Company, and the defendant had the contract to remove
this tank from the depot to the brewery, and to there in-
stall it in the plant. Plaintiff assisted in moving the tank

from the depot to the brewery, and had charge of the gang which installed it. He testified that Mr. Turner, one of defendant's officers, handed him the shipping bill for the tank and equipment. The weight of the entire shipment as shown on the bill was 24,000 pounds. The weight of the tank was not given separately upon the shipping bill, but plaintiff was informed by Mr. Turner that it weighed 6,000 pounds. The tank, in fact, weighed, according to plaintiff's estimate, about 9,000 pounds. Plaintiff himself selected the ropes used upon the job from the rigging barn of defendant.

The lead rope selected was 400 feet long and $1\frac{1}{4}$ inches in diameter. This rope was capable of sustaining a weight of 6,000 pounds. The tank was jacked up, placed over the opening, and raised preparatory to lowering it into the receptacle prepared for it. At this point plaintiff mounted to the top of the tank to examine the rope and the blocks, being under the belief that the rope was chafing on the blocks. He found everything apparently right, and returned to the ground. It was then discovered that the rope or lead line was cutting or fraying upon the sharp edge of the tank. Whether this was noticed first by plaintiff or Mr. Turner is in doubt, as plaintiff testifies in one portion of his evidence that he saw it first and in another portion that Mr. Turner discovered it. It would seem to be immaterial which version is correct. The condition was discovered, and was known to both. Plaintiff testified that thereupon Mr. Turner said to him: "George, go up there and clear that line." He further testified:

"I got upon the tank and looked over the side of the tank, and I says, 'Hand me up a piece of 2x4.' He handed it up, and I sticks it down, and immediately I got it clear, away I goes."

On cross-examination plaintiff testified:

"I would not have gone up there if I knew an accident was going to happen. When I walked around there before I went up, it did not look very good, and it did not look very much better when I got up there, the way I

had to pry it out.   The line was not chafing very much.
I did not bring down the 800-foot line, because it was too
heavy a line to use altogether.   If the rope carried 6,000
pounds, I thought it would carry 6,000 pounds down the
hole.

"*Q.* If you thought it was dangerous, why didn't you
go over there a block and a half and get that 800 feet of
line?

"*A.* I didn't think it would go as quick as it did.

"*Q.* What is that?

"*A.* I didn't think it was going to break as it did.

"*Q.* You didn't think it was going to break so soon?

"*A.* No; if it carried 6,000 pounds, I thought it would
carry 6,000 pounds down the hole.

"*Q.* You just saw a break in it and calculated in your
mind, if it was 6,000 pounds, that it would carry; you
thought it would be good enough?

" *Mr. Conlon:* I submit that is not a fair cross-exam-
ination of this witness.

" *The Court:* Objection overruled.   (Exception for
plaintiff.)

"*A.* Yes, sir."

On redirect:

"*Q.* You stated that you did not want to go upon this
tank when you were ordered to go by Mr. Daniel Turner?

"*A.* Yes, sir.

"*Q.* If you did not want to go, why did you go?

"*A.* I looked at the tank, and I said, ' Well, it has got
to be done,' and I went up and did it.

"*Q.* You stated that it did not look very good to you.
What did you mean by that, when you were on top of the
tank?

"*A.* Well, when I got up there and saw it was chafing
that way, it didn't look very good when it was chafing.
I went there on the tank, and I came down again, and
looked the thing all over, and when I saw the thing had
to be done I went up and done it."

Louis Delos, a witness for plaintiff, testified:

"I came down off of the tank, and said, ' The line is
chafing there,' and Turner said:   ' George, go up and see
what is the matter with it.'   Mr. Turner says, ' Clear it,
George, clear the line,' and as he started to clear the line
the fall gave, and the lead line broke."

On cross-examination:

" *Q.* Do I understand that you and Mr. Coleman looked the job over to see if it was all right aloft ?

" *A.* Yes, sir.

" *Q.* And it looked all right to you ?

" *A.* Yes, sir.

" *Q.* And it looked all right to Coleman, apparently, except that this line chafed ?

" *A.* All except the line.

" *Q.* If the line had not chafed on that sharp edge of the tank there, the accident would not have happened ?

"*A.* No, sir.

" *Q.* I understand that for, perhaps, years you had worked for Mr. Coleman on various jobs ?

"*A.* Yes, sir.

" *Q.* And he thoroughly understood his business ?

" *A.* Yes, sir.

" *Q.* And he didn't need the Turners to tell him what to do ?

" *A.* Why, no.

" *Q.* He could tell the Turners things, could he not ?

" *A.* Yes, sir."

George Leighton, also sworn for plaintiff, testified:

"At that time I was working for the Detroit Brewing Company lowering a tank. The tank was skidded on six-inch stuff. We dragged the tank over the top of the hole and raised it up. I told George that the tank was over the weight he told me. It dragged pretty hard. There were four of us on the winch at times. The wagon was turning over. I could hoist five tons on this slow gear, if everything was clear. We had it up a piece to try it over the top of the pit, and Mr. Turner (sitting over there) said, ' The line is chafing.' Mr. Turner over there advised George to go up and clear the line, and he hollers to me to hand him a piece of stuff to pry it clear. Then, when Coleman pried that off the side of the angle the lead line parted right there."

On cross-examination:

" I told Mr. Turner, when Coleman was there, that the tank would run over the weight that he first said.

"*Q.* Where was it that you told Mr. Turner that the tank would run over the weight ?

"*A.* I didn't tell him that.

"*Q.* Who did?

"*A.* I told it to George.

"*Q.* Where did you tell him that?

"*A.* Right in the building.

"*Q.* Coleman was right there?

"*A.* Coleman was right there.

"*Q.* And you told Mr. Turner, in Mr. Coleman's presence, that the tank would run over the weight he first said?

"*A.* Yes, sir.

"*Q.* That was the first time that you told Mr. Turner that that was over the estimated weight?

"*A.* We would not know.

"*Q.* Who would know?

"*A.* You would know naturally yourself, when you were putting it up in the falls.

"*Q.* Coleman would know as much about it as Turner?

"*A.* I think he ought to.

"*Q.* He was foreman of the gang?

"*A.* Yes, sir.

"*Q.* He was working on it all that morning?

"*A.* Yes, sir.

"*Q.* But the first time you saw Turner you told him it was a heavier tank than you expected?

"*A.* Yes, sir.

"*Q.* And that was long before the accident?

"*A.* Yes, sir."

At the conclusion of plaintiff's case, a verdict was directed for defendant, upon the ground that plaintiff had assumed the risk of injury.

BROOKE, J. (*after stating the facts*).   The first seven assignments of error are based upon rulings of the court as to the admission of testimony.   Answers to several questions put to plaintiff upon redirect examination were excluded.   Plaintiff testified fully upon direct, redirect, and cross-examination.   The questions to which objection was made and answers to which were excluded were either leading in character, or called for a mere repetition of evidence already in the case.   There was no abuse of discretion in the rulings of which complaint is made.

The other assignments all relate to the direction of a verdict and the denial of a motion for a new trial.

The meritorious question involved is whether, under the evidence, a verdict was properly directed in defendant's favor upon the ground assigned.

It is urged upon the part of the plaintiff that he was misinformed as to the weight of the tank; and that the defendant is responsible for such misinformation. We think it is clear that plaintiff had quite as good an opportunity of judging of the weight as did the defendant. It may even be presumed that he had a better opportunity; for he assisted in removing it from the depot to the premises where it was to be installed. But, in any event, he was not misled to his injury; for in raising the tank, preparatory to lowering it into its receptacle, it became apparent that it weighed more than 6,000 pounds. This fact was reported to plaintiff by one of his own witnesses some time before the accident happened.

It is next urged that plaintiff was not furnished with suitable appliances with which to do the work. The record shows that a longer and heavier rope was owned by defendant. This rope, plaintiff testified, he could not use, because it could not be reeved through the block. Whether it was plaintiff's duty to have secured a larger block and to have used the heavier line need not be determined; for the record does not show that the line actually used was inadequate. Plaintiff's witness Delos testified:

"*Q.* And it looked all right to Coleman, apparently, except that this line chafed?

"*A.* All except the line.

"*Q.* If the line had not chafed on that sharp edge of the tank there, the accident would not have happened?

"*A.* No, sir."

It is therefore apparent that, in the opinion of this witness, the line parted because of the chafing or cutting, and not because it was too light. But, even assuming that the rope was provided and selected by the defendant, the legal aspect of the case is not changed by that fact. At the

moment plaintiff mounted the tank and undertook to free the fraying line, the exact situation was open, apparent, and actually known to him.   He says:

"When I walked around there before I went up, it did not look very good to me, and it did not look very much better when I got up there, the way I had to pry it out."

The plaintiff having equal, if not greater, experience in the line of his work than the officer of the defendant company, who was present, with knowledge of the defect and appreciation of the danger, undertook the performance of the act which resulted in his injury.   It must be held, as a matter of law, that he assumed the risk of injury in the premises.   *Bauer* v. *Foundry Co.*, 132 Mich. 537 (94 N. W. 9), and cases there cited; *Swick* v. *Cement Co.*, 147 Mich. 454 (111 N. W. 110), and cases there cited and digested.   See, also, 26 Cyc. p. 1177, and notes.

The judgment is affirmed.

STEERE, C. J., and MOORE, McALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.