# THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v. THEOBALD FLOUR MILLS COMPANY AND ANOTHER.

## MARYLAND CASUALTY COMPANY, APPELLANT.[1]

February 9, 1923.

No. 23,093.

**Indemnity bond not limited to cases where bill of lading was lost or missing.**

1. An indemnity bond was issued to protect a railroad company upon the delivery by it of grain to the consignee, though the bill of lading was not surrendered or the accompanying draft paid. It is *held* that the bond was not limited to instances where the bill of lading was lost or missing.

**Surety not released by failure of consignee to surrender bill of lading.**

2. The bond contained an agreement by the consignee to surrender the bill of lading to the railroad company within 5 days from the receipt of the grain. There were continued and repeated failures on the part of the consignee to do so, none of which was due to its fraud or dishonesty. The railroad company did not waive the requirement nor give an extension of time. It is *held* that such failure did not release the surety on the bond.

**Bond not illegal.**

3. There was no illegality in the undertaking of the defendant, because of the provisions of the Transportation Act, or the orders of the Interstate Commerce Commission, releasing it from its assumed liability on the bond.

Action in the district court for Ramsey county to recover $20,638.-84 upon an indemnity bond. The case was tried upon stipulated facts before Hanft, J., who made findings and ordered judgment for the amount demanded and interest. From the judgment entered pursuant to the order for judgment, defendant appealed. Affirmed.

[1]Reported in 191 N. W. 920.

*Barrows & Metcalf, Arthur A. Stewart,* and *J. F. Dammann, Jr.* for appellant.

*OBrien, Stone, Horn & Stringer* and *Daniel Taylor,* for respondent.

DIBELL, J.

Action to recover upon an indemnity bond issued by the defendant Maryland Casualty Company to the plaintiff railway company. There was judgment for the plaintiff for $22,414.03 upon a trial by the court.

The indemnity bond was signed by the Theobald Flour Mills Company, as principal, and the defendant Maryland Casualty Company as surety. The plaintiff was the obligee. It did not execute the bond. It prescribed the form.

The purpose of the bond, so far as important here, was to procure the immediate delivery of cars of grain coming to the mills company at Northfield. The bills of lading, with the drafts attached, were in usual course sent by the shippers to a local bank. Without their surrender the railway company delivered the grain at its peril. Such delivery was a conversion. The bond recited as follows: :

"Whereas said principal [the mills company] for the sole advantage thereof expects to request from time to time during the life of this bond, the obligee [the plaintiff] or one or more of the other companies which may have transported or received such freight shipped by or consigned to said principal, or consigned to others with directions to notify said principal, or consigned to said principal with directions to notify others (commonly termed 'shippers order freight') to undertake to perform one or more of the following things to-wit:

"1. To undertake, at the request of said principal, to deliver or cause to be delivered to said principal or to others, such freight with or without surrender of the original bill of lading or shipping receipt therefor."

The surety company agreed that it would save the railway company harmless from liability for such deliveries. Liability on the bond was limited to $30,000. The mills company paid the surety

company for the obligation which it assumed. The railway company delivered to the mills company a number of cars without the surrender of the bills of lading. Liability was asserted against it by the shippers and it paid. The bond contained this provision:

"Also, in consideration as aforesaid, said principal covenants with the obligee as follows:    *    *    *

"2. That said principal shall and will within five (5) days from the time of delivery of any such freight, surrender to the obligee the original bill of lading or shipping receipt therefor duly indorsed, or, if any such bill of lading or shipping receipt shall have become delayed or lost, will if and when the same shall have been received or be found, promptly deliver it to the obligee or any company or carrier entitled thereto hereunder."

1. The casualty company contends that it was liable only in the event that bills of lading were lost or delayed and did not arrive until after the arrival of the grain. This was an unusual occurrence. None of the cars delivered during the course of the transaction under consideration arrived prior to the bills of lading. The language of the bond indicates no purpose to restrict liability to such unanticipated occurrences. It indicates a purpose to assume liability for freight delivered though the ladings are received but not surrendered and the drafts not paid.

2. The casualty company contends that it is released from liability because of the failure of the railway to notify it of the mills company's failure to surrender the ladings within 5 days from the time of the delivery of the freight as it agreed to do.

We have been cited to no case involving a like contract. It is usual for policies of indemnity or insurance to require the obligee to give the surety notice of a default of the principal which may affect the surety's obligation. The bond before us does not. If such requirement is in the bond it is because of the nature of the contract.

The railway was helpless to prevent a default by the milling company. When a default occurred it could notify the casualty company. It did not agree to do so. In the absence of an agreement to give notice, there inhering in the default no criminality or fraud or dishonesty, the holdings do not seem to require it. Thus, in In-

habitants of Wakefield v. American Surety Co. 209 Mass. 173, 177, 95 N. E. 350, where there was a default of the contractor, the court said:

"There was no obligation on the part of the plaintiff to keep the defendant as surety constantly advised as to the state of the work under the contract. The surety must protect his own interest to the extent of seeing that his principal performs the duty which he has guaranteed."

So, in Maine Cent. R. Co. v. National Surety Co. 113 Me. 465, 94 Atl. 929, L. R. A. 1916A, 881, involving a construction contract, the court said [at page 470]:

"But there was no provision in the contract of suretyship for any such notice. In the absence of such provision there was no duty on the plaintiff to keep the surety constantly informed as to the state of the work under the contracts. In such case the surety must protect his own interest to the extent of ascertaining that his principal is performing his duty under the contract which he has guaranteed."

In Watertown Fire Ins. Co. v. Simmons, 131 Mass. 85, 86, 41 Am. Rep. 196, where a bonded agent of an insurance company, with personal sureties, failed to pay monthly, as required, his default not being occasioned by fraud or dishonesty, the court said:

"If a creditor does any act which injuriously affects the situation and rights of the surety, such as giving time to the debtor, or relinquishing security which he holds for the debt, he discharges the surety either in whole or *pro tanto*. But the creditor owes no duty of active diligence to take care of the interest of the surety. It is the business of the surety to see that his principal performs the duty which he has guaranteed, and not that of the creditor. * * * The surety is bound to inquire for himself; and cannot complain that the creditor does not notify him of the state of the accounts between him and his agent, for whom the surety is liable. Mere inaction of the creditor will not discharge the surety unless it amounts to fraud or concealment."

In Lancashire Ins. Co. v. Callahan, 68 Minn. 277, 71 N. W. 261, 67 Am. St. 475, this court said [at page 280]:

"The law as to this defense is that, where there is a continuing suretyship for the faithful discharge of his duties by a servant, if the master discovers that the servant has been guilty of dishonesty in the course of the service, and thereafter continues him in such service, without notice to and the assent of the surety, express or implied, to such course, the latter is not liable for any loss arising from the dishonesty of the servant during his subsequent service. But this rule has no application to cases of mere breaches of duty or contract obligations on the part of the servant not involving dishonesty on his part, or fraud or concealment on the part of the master."

Other cases announce the same doctrines. Capital Fire Ins. Co. v. Watson, 76 Minn. 387, 79 N. W. 601, 77 Am. St. 657; Manchester & Co. v. Redfield, 69 Minn. 10, 71 N. W. 709; Union Cent. Life Ins. Co. v. Prigge, 90 Minn. 370, 96 N. W. 917; Welch v. Walsh, 177 Mass. 555, 59 N. E. 440, 52 L. R. A. 782, 83 Am. St. 302; Howe Mach. Co. v. Farrington, 82 N. Y. 121.

We are not to be understood as holding that cars might not be delivered without the surrender of bills of lading in such numbers and under such circumstances as would relieve the surety from liability. If there were fraud or concealment or such negligence as to constitute bad faith or wrongdoing such result might follow. The situation might be such as to cast upon the obligee, as a matter of common business honesty, the duty of informing the surety or refusing to deliver more cars.

The court finds that there was no waiver on the part of the railway company of the requirement that the milling company deliver the bills of lading within 5 days. This finding is sustained. It includes a finding that there was no extension of time of delivery. The railway company was persistently after the milling company. It is true that there were continued and repeated delays and defaults on the part of the milling company. At no time were there more than a few undelivered ladings. The company was having a hard

time to meet its payments. It was slow. Its motor burned and it was delayed for 10 days. It is not clear that a waiver of defaults would have released the surety. See Fitger Brewing Co. v. American Bonding Co. 127 Minn. 330, 149 N. W. 539; Fitger Brewing Co. v. American Bonding Co. 115 Minn. 78, 131 N. W. 1067; Lakeside Land Co. v. Empire State Surety Co. 105 Minn. 213, 117 N. W. 431. At one time one of the officers of the railway company, deliveries apparently having been stopped because of the delay of the milling company in delivering bills of lading, wrote it, upon protest being made, that deliveries would be continued with the understanding that the outstanding ladings be cared for within 10 days. This was not an extension of the time. The railway company could have sued immediately afterwards if it could have sued before. It was a mere promise that it would continue deliveries if ladings then due were delivered within 10 days. It was not an extension of the 5-day period.

3. The defendant urges that the bond, construed as we construe it, is illegal as aiding forbidden transactions. The point is that under General Order No. 25 of the Director General, effective July 1, 1918, credit such as extended here could not be given. Paragraph 2 permitted a limited credit upon giving bond. Paragraph 5 provided that freight consigned as that here involved could be delivered only in the event of the loss or delay of the ladings and then only upon the giving of a bond. It is claimed that these provisions were continued in force by the Transportation Act. 41 St. c. 91, 456. By its order No. 73, of June 4, 1920, effective July 1, 1920, the Interstate Commerce Commission provided for the extension of a limited period of credit. It was after this that the cars involved in this action were delivered. Of course credit cannot be extended in such a way as to constitute a discrimination. In any event the carrier got its earnings promptly. There was nothing inherently wrong in the device of a bond to secure immediate delivery. We need not inquire whether the giving of bonds which operate to give credit to the consignee offends the policy of railway rate regulation as determined by the Transportation Act or the orders of the Interstate Commerce Commission. We make no effort to trace the pro-

visions of the Transportation Act or the orders of the commission. There is in no event illegality which releases the insurer from its assumed liability.

Judgment affirmed.

In April 13, 1923, the following opinion was filed:

## AFTER REARGUMENT.

DIBELL, J.

A reargument of the question discussed in paragraph 2 of the opinion was granted.

Counsel for the surety company complains that the court inaccurately stated his position when it said that "the casualty company contends that it is released from liability because of the failure of the railway to notify it of the mills company's failure to surrender the ladings within 5 days from the time of the delivery of the freight as it agreed to do." The statement is incomplete and faulty and the result of an imperfect analysis of counsel's contention. Counsel's claim is that the surety undertook to indemnify the railway company in a definite course of dealing with the mills company; that the 5 day clause was a vital limitation; that the railway company could not permit an essential departure without acting in bad faith; and that there was such a continuing departure that if a recovery is permitted the surety is held to indemnify against loss through a course of dealing not in contemplation. This we think fairly states the defendant's position. Still, the failure to notify is deemed by the defendant important upon his claim just now stated.

The railway could not prevent a particular default, for there was none until 5 days after a delivery. What it did was to prod the mills company and this with some vigor. Aside from this, or in addition to it, it could have notified the surety that the mills company was not delivering the ladings within 5 days after the receipt of the cars; or it could have refused to make further deliveries of the cars.

The 5-day covenant, as contended by counsel for the plaintiff, was between the mills company and the railway. The surety company did not insure its performance. This is apparent from the language immediately preceding the covenant, which states who the parties to it are. It is plain, too, if we note paragraph 3, immediately following paragraph 2 quoted in the opinion, which covenants that the mills company would pay the railway company "all charges on every such shipment, including those for freight, demurrage, advances, car rentals, care of freight," etc. that the surety did not guaranty that the milling company would perform its covenants with the railway company. This covenant is on the same basis as the one in paragraph 3. Its performance is not insured. It, like the other covenant, is between the mills company and the railway. The 5-day covenant, however, was in the bond, a contract between the milling company and the railway, and so it was competent to be considered in construing the bond and determining the insurer's liability.

We have re-examined the record in the light of the additional arguments and with a more accurate perception of the defendant's contentions. What was said in the opinion relative to the necessity of notice to the surety of the defaults of the milling company, and the law relative to notice, applies.[1] The insurer did not provide in its bond for notice. The railway company did not agree to give notice. We cannot construe the course of dealing, though there were continuous defaults, as indicative of dishonesty or bad faith on the part of the railway. Nor can we say that the situation was such that the railway should have ceased deliveries. Nor can we say that there was such a departure from the course of business contemplated that the surety was released. So far as the case involves a question of fact the defendant is concluded by the finding of the trial court.

It should have been mentioned in the former opinion, and it is noted now, that the railway company, in endeavoring to induce greater promptness on the part of the mills company, often referred to its covenant to deliver the ladings within 5 days as if its failure

[1Page 465, et seq.]

to perform might invalidate the bond. This is not at all a controlling fact and does not determine the proper construction.

We adhere to our former decision and the judgment stands affirmed.