## CENTRAL METROPOLITAN BANK OF ST. PAUL v. THE FIDELITY & CASUALTY COMPANY OF NEW YORK.[1]

April 4, 1924.

No. 23,784.

**Rights of creditor bank preserved by notice to surety of debtor's default.**

A grain company borrowed money from a bank, pledging bills of lading of grain in transit as security, which it desired thereafter to withdraw from time to time. It gave a bond conditioned for their return or the deposit of the proceeds of the sale of the grain. Whenever a bill of lading was withdrawn a receipt was given, providing that a disposition order covering the grain should be delivered to the bank during business hours of the same day. This provision was habitually disregarded. The bond required the bank, when it became aware of any act which might be made the basis of a claim, or discovered facts indicating that a loss had probably been sustained, to notify the surety thereof within 5 days by registered letter.

The grain company withdrew 13 bills of lading, sold the grain and deposited the money in the bank, where it kept but one general account. The indebtedness these bills of lading secured was not paid. Several weeks after their withdrawal, the bank made demand for their return or payment of the indebtedness. Four days later it registered and deposited in the post office a notice to the surety of the grain company's default. The notice was not received until three days after it was mailed. *Held:*

(1) That whether the bank had actual or constructive notice of the default before it made the demand was a question for the jury.

(2) That whether the bank was chargeable with notice that the proceeds of the sale of the grain represented by the 13 bills of lading had been deposited, or negligently permitted the grain company to check out money belonging to the bank, were also questions for the jury.

(3) That it was the duty of the bank to give the surety notice whenever the facts would indicate to a prudent man that a loss was threatened, but, so long as good faith was observed, the bank was under no active duty to supervise the grain company's methods of doing business.

[1]Reported in 198 N. W. 137.

(4) That the notice mailed as directed in the bond was sufficient to preserve the rights of the bank, though not received until after the expiration of 5 days from the date of the demand.

Action in the district court for Ramsey county to recover $12,600. The case was tried before Olin B. Lewis, J., who at the close of the testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $21,879.08. From an order granting defendant's motion for judgment notwithstanding the verdict, plaintiff appealed. Reversed.

*Christofferson, Walsh, Christofferson & Jackson,* for appellant.

*A. V. Junkin* and *Briggs, Weyl & Briggs,* for respondent.

LEES, C.

Action on a bond wherein the Consumers Grain Company is the principal; the respondent, the surety; and appellant, the obligee. Appellant had a verdict and has appealed from an order for judgment for respondent notwithstanding the verdict. For convenience, appellant will be designated as the bank, respondent as the surety company, and the principal in the bond as the grain company.

The last named company dealt in grain at St. Paul, borrowing money and giving its notes to the bank, secured by bills of lading covering grain in transit. The bond was executed on September 25, 1920, and was to continue in effect for one year. It recited that, whenever the grain company withdrew pledged bills of lading, it should give receipts for them, showing that it had possession as agent for the bank; that it was to return them upon due demand, or replace them with disposition orders covering the same grain, or, if the grain was sold, to pay to the bank the money received, but not more than the amount for which the bills of lading had been pledged. If these conditions were fulfilled, the obligation of the bond would be discharged. There was a clause which read as follows:

"Provided, however, * * * that the obligee after becoming aware of any act which may be made the basis of a claim hereunder or the discovery of facts indicating that a loss has probably

been sustained shall within five days notify the Surety of such act in writing by registered letter at its Home Office."

The form of receipts to be used was not specified save in the general terms of the bond to which we have referred. It is designated in the record and briefs as a trust receipt to indicate the nature of the contract it evidenced.

The grain company's business was extensive. On many occasions it withdrew pledged bills of lading, giving receipts therefor which were always in the same form. After describing the bills of lading by reference to the cars, the receipts read thus:

"The undersigned expressly undertakes and agrees as such Agent, to endorse and deliver to said Bank before the close of business this day, duplicate disposition orders duly receipted by such Joint Freight Agent, covering said bills of lading and to effect the sale and delivery of said property and to pay over all proceeds derived therefrom as and when received by said Bank to be by it applied on said loans and advances, it being expressly understood that said bills of lading, the duplicate disposition orders obtained in place thereof, and all property represented by said bills of lading and such property or any part thereof, the claim against the purchaser or purchasers for the selling price and the selling price as soon as paid by the purchaser or purchasers shall be the property of said Bank, held in trust, and not otherwise by the undersigned."

' Thirteen notes secured by bills of lading were not paid. The bills of lading were withdrawn between the sixteenth and twenty-sixth of July, 1921, and the usual receipts given. The grain they covered was sold and the proceeds deposited in the bank and credit given to the grain company upon the general account on which it drew checks. In accordance with its usual practice it had issued checks to take up all its other notes, but failed to do so as to the 13, representing the amount claimed under the bond.

On September 10, 1921, a written demand was made for the return of the 13 bills of lading or the delivery of disposition orders representing the grain, or the money received if it had been sold. On September 14 a copy of the demand and a notice that it had

not been complied with were sent to the surety company at its home office by registered letter. The notice was not received until September 17. Later, the bank sued for $19,800 damages for the breach of the conditions of the bond. A recovery was resisted on the grounds hereafter mentioned.

The grain company's obligation, as expressed in the bond and in the trust receipts, is somewhat different. The bond required performance when demanded, and the receipts, on the very day when the bills of lading were withdrawn. It is important to determine whether the terms of the bond or those of the receipts fix the date of the grain company's default and the time to notify the surety thereof. The jury were instructed that, if the form of receipt was agreed upon when the bond was executed, it became part of the bond and defined the duties of the parties. Later, when respondent's motion for judgment was granted, the court held that as a matter of law the receipts were part of the bond. Without deciding whether this is the correct conclusion, we will assume for the purpose of the discussion only that the receipts should be treated as part of the bond. Upon this hypothesis, does the conclusion follow that there can be no recovery?

The evidence showed that the bank was told that the purpose of withdrawing the bills of lading was to increase the volume of business; to permit the mixing of low and high grade grain, which had to be done in grain elevators before delivery to the purchasers; and to permit the sale of grain to the state, which did not pay until 30 days after delivery. It showed that the grain company had about a thousand transactions with the bank during the year covered by the bond and that in the aggregate they amounted to about $2,000,000. In the main the money was furnished by the bank, the company's resources being somewhat limited. In few of its transactions with the bank did the grain company comply with the literal requirement of the trust receipts respecting the time of delivery of duplicate disposition orders covering the original bills of lading. With respect to the habitual failure of the principal to observe one of the terms of its contract with the obligee and the latter's continued acquiescence therein, the situation is the same as

in Chicago, R. I. & Pac. Ry. Co. v. Theobald F. M. Co. 154 Minn. 463, 191 N. W. 920, 193 N. W. 306. It is also the same in that no fraud or dishonesty inhered in the default of the principal. As to the time of performance, there may have been a waiver of the requirement of the trust receipts, but, as stated in the case cited, if there was, it does not necessarily follow that the surety was released.

The important question is whether the failure to bring in disposition orders or the bills of lading on the day when the bills were withdrawn made it the duty of the bank to give the surety company notice thereof. If, from that circumstance alone, a prudent man would have concluded that a loss had probably been sustained or that there was a basis for a claim against the surety company, the duty to give the notice arose long before it was given. But the situation must be viewed as it appeared at the time of the transactions and not as it appears in the light of subsequent developments. When thus viewed, there is room for an honest difference of opinion, and hence it was for the jury to say whether the bank had actual or constructive notice prior to September 10 of acts which might be made the basis of a claim or that a loss had probably been sustained.

Were the conditions of the bond fulfilled when the proceeds of the sale of the grain were deposited in the bank? The jury were instructed that, if the trust receipts were part of the surety company's contract with the bank, the money received for the grain belonged to the bank, and if, with notice that any deposit included money so received, the bank applied or permitted the application thereof upon an indebtedness not secured by the bills of lading, there could be no recovery; also that, if the bank failed to exercise reasonable care to prevent withdrawal of its own money to pay other indebtedness, there could be no recovery.

It is urged that the evidence showed conclusively that the bank was chargeable with such notice and that it was negligent as a matter of law. We cannot sustain this contention. It is not clear that the bank knew or should have known the character of each deposit. It does not appear that all the grain the company pur-

chased was held by the bank as security. Whenever grain was sold for more than the amount of the debt secured, a portion of the money belonged to the grain company. There was an intermingling of the company's money with the bank's money. It all went into one account. The bank's share was transferred to it by the company's checks drawn on the account.

At this point the contention is made that, if the bank knew the character of the funds credited upon the account, it was bound to retain its portion, and, if it did not know their character, its negligence enabled the grain company to appropriate the money which the bank should have kept and defeats a recovery. The contention cannot be sustained. If it were, the duty of active supervision of the grain company's methods of doing business would be placed upon the bank. It is the business of the surety rather than the obligee to see that the principal performs the duty which the surety has guaranteed. The bank could not shut its eyes to anything indicating a probability of loss. It was under a duty to give the surety notice whenever a situation arose which would indicate to a prudent man that a loss was threatened, but, so long as good faith was observed, the bank was under no active duty to ascertain whether a loss was probable or to prevent the continuance of the default of the grain company. Spencer, Suretyship, § 224; Stearns, Suretyship, § 95; 21 R. C. L. p. 993.

Were the requirements of the bond with respect to notice complied with? When the circumstances were such as to give rise to a duty to give the notice, the surety was to be notified within 5 days by registered letter. The notice was mailed, but not received within 5 days. Notice could only be given by registered letter. It has been held that, when service of a notice by registered letter is authorized, the service is deemed to be complete when the letter is registered and mailed, Ross v. Hawkeye Ins. Co. 93 Iowa, 222, 61 N. W. 852, 34 L. R. A. 466, and that, where a contract of insurance required written notice of an illness within 10 days from the beginning of the illness, a notice mailed within 10 days was sufficient, although it was not received until after the 10 days had gone by, Craig v. U. S. H. & A. Ins. Co. 80 S. C. 151, 61 S. E. 423, 18 L. R.

A. (N. S.) 106, 128 Am. St. 877, 15 Ann. Cas. 216, but the opposite conclusion was reached in McCord v. Masonic Cas. Co. 201 Mass. 473, 88 N. E. 6.

This court has held that service of notice by mail as provided by statute is complete when the notice is properly mailed, Hoff v. N. W. Elev. Co. 120 Minn. 224, 139 N. W. 153; and that when notice by mail is required it is deemed given either when the paper is mailed or when it is or should be received in the regular course of the mails. Bridges v. Nat. Union, 73 Minn. 486, 76 N. W. 270, 409, 77 N. W. 411. In Hoban v. Hudson, 129 Minn. 335, 152 N. W. 723, L. R. A. 1916B, 1114, the manner of giving notice was not prescribed by the contract. It was held that notice could not be served by mail in the absence of consent by the parties to be served, but, if the mails were used as the medium of service, the service was not complete until the notice was received. That case is distinguishable from this because here the only authorized medium for the transmission of notice was a registered letter. If the position of the surety company can be sustained, a notice, although it had been mailed on September 10, would not have been good if, by reason of delayed trains or a mistake on the part of an employe in the post office, or for any other cause beyond the control of the bank, it was not delivered until after September 15, in spite of the fact that the post office department was the agency selected by the surety to carry the notice to its home office. We hold that, when the bank deposited the notice in the post office within the time and in the manner specified in the bond, the surety was notified as required by the provision of the bond.

The order for judgment notwithstanding the verdict must be reversed. The motion was in the alternative, a new trial being asked for only if the motion for judgment was denied. When the remittitur goes down, the case will be in the district court with the motion for a new trial pending, to be disposed of in that court. See Kies v. Searles, 146 Minn. 359, 178 N. W. 811.

Order reversed.